IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AUSTIN T. SCOTT, | : |
| Plaintiff | : |
| | : |
| vs. | :    CIVIL NO. 4:CV-09-1989 |
| | : |
| LANCE MARSHALL, et al. | : |
| Defendants | : |

*M E M O R A N D U M*

I.   *Introduction*

On October 5, 2007, plaintiff, Austin T. Scott, and Desiree Minder, had

sexual intercourse at his apartment on the campus of The Pennsylvania State University,

located in Centre County, Pennsylvania.  Based on this encounter, Scott was arrested on

a charge of rape and other sexual assault offenses.  However, about six months later, the

district attorney decided to dismiss the charges.  In a prior criminal proceeding in which

Minder was also the complaining witness the defendant there had been acquitted of a

charge of rape, and the trial court in Scott's case ruled that Scott could enter this result

into evidence at his trial.  It was after this ruling that the district attorney dismissed the

charges, stating that he could no longer prove the case against Scott beyond a

reasonable doubt.

Scott then filed this civil-rights action.  He named the following defendants, which we group as follows: (1) Centre County;, Michael Madeira, the county's district attorney; and Lance Marshall, an assistant district attorney; (2) The Pennsylvania State University (Penn State); Stephen Shelow, Penn State's director of University Police; Thomas Sowerby, assistant director of the University Police; Matthew Cover, Ryan Rodgers, Dustin Miller, Stephanie L. Brooks, and Christine D. Vile, Penn State police services officers; and (3) Desiree Minder.[1]

There are eleven claims in the complaint.  Scott makes the following federal civil-rights claims against all the individual defendants: false arrest (Count I); malicious prosecution (Count II); and false imprisonment (Count III).  He makes a federal claim of "supervisory liability" against certain unnamed supervisory defendants (Count IV), a federal "failure to intervene" claim against certain unnamed non-supervisory defendants (Count V), a federal civil conspiracy claim against all the individual defendants (Count VI), and a federal "governmental liability" claim against Centre County and Penn State (Count VII).[2]  Plaintiff also makes the following state-law claims against all the individual defendants: a claim under Pa. Const. art. I, § 8, which prohibits unreasonable searches and seizures, the Pennsylvania constitutional counterpart to the Fourth Amendment, U.S. Const. amend. IV (Count VIII)[3]; a claim for false arrest and illegal imprisonment (Count

---

[1]    Plaintiff also named as defendants "John/Jane Does 1-10," unknown individuals working for the University Police or the Centre County District Attorney's Office.

[2]    In the complaint, incorrectly styled as Count V.

[3]    In the complaint, incorrectly styled as Count VI.

IX)[4]; a claim for malicious prosecution (Count X)[5]; and a claim for civil conspiracy (Count XI).[6]

Centre County, Madeira, and Marshall filed separate motions to dismiss. While the case was assigned to the late Judge James F. McClure, Jr., these motions were granted, and the moving defendants were dismissed from the case. *See Scott v. Marshall*, 2010 WL 785282, at *5 (M.D. Pa. Mar. 3, 2010)(McClure, J.).

The case has been transferred to the undersigned, and we are considering two motions for summary judgment, one filed by defendant Desiree Minder, and the other by the "Penn State defendants," Penn State and the individual defendant law-enforcement officers in its employ who investigated Minder's charges.

II.   *Standard of Review*

Under Fed. R. Civ. P. 56, the movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P.

---

[4]   In the complaint, incorrectly styled as Count VII.

[5]   In the complaint, incorrectly styled as Count VIII.

[6]  In the complaint, incorrectly styled as Count IX.

56(c)(1)(A).  The party opposing summary judgment may not rely on statements in briefs,

*Smith v. Kyler*, 295 F. App'x 479, 481 (3d Cir. 2008)(per curiam) (nonprecedential)

(quoting *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 511-12 (3d Cir. 1994)), but his

evidence "'is to be believed, and all justifiable inferences are to be drawn in his favor.'"

*Colwell v. Rite-Aid Corp.,* 602 F.3d 495, 501 (3d Cir. 2010) (quoting *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

With this standard in mind, the following is the background to this case for

summary-judgment purposes, as properly supported by the evidence the parties

submitted and their admissions to the opposing parties' statement of material fact.

III.   *Background*

Scott and Minder were both Penn State students.[7]  They first met around

August or September 2007.  (Doc. 69-2, Scott Dep., CM/ECF p. 6).[8]  In the early morning

hours of October 5, 2007, Minder was with some friends in two bars in State College,

Pennsylvania, where Penn State is located.  They were first at Tony's Big Easy, where

Minder had a couple of mixed drinks made with vodka, leaving her a little intoxicated.

(Doc. 69-3 Minder Dep., CM/ECF p. 9).  They then went to The Saloon, where she

---

[7]  As noted, on a motion for summary judgment, we accept the nonmoving party's evidence and view all the evidence in the light most favorable to him.  Hence, the recitation of what happened at Scott's apartment is based on his testimony at his deposition.  Minder's testimony is different, most obviously in her assertion that she was forced to have sex with him by way of at least one punch and her fear that he would hit her again.  (Doc. 69-3, CM/ECF pp. 16-17).

[8]   The page numbers used are the page numbers assigned by the Case Management/Electronic Case Files (CM/ECF) system.

ordered some mixed drinks, again made with vodka.  (*Id.*, CM/ECF p. 91).  During this

time, Scott and Minder exchanged text messages, with Minder texting while she was at

The Saloon, "Come get me."  (Doc. 65-9, defendant Rodgers' police report, CM/ECF p.

12).

When Scott arrived, Minder met him outside and guided him downstairs to

the bar, which was in the basement.  (Doc. 69-3, Minder Dep., CM/ECF p. 13).  Scott

finished her drink for her, (*id.*), and they left, at around 2:00 a.m., according to one police

report.  (Doc. 65-8, defendant Cover police report, CM/ECF p. 3).  As they were walking

in the direction of Scott's apartment, Minder, according to Scott, made the decision to go

to his place.  (Doc. 69-2, Scott Dep., CM/ECF p. 7).  According to Minder, she "agreed to

go back to his house," although her "first choice" would have been to go to her own

house, but she "was drunk," and he "offered to let [her] crash" at his place, so she "said

okay."  (Doc. 69-3, Minder Dep., CM/ECF p. 14).

As they were walking to Scott's apartment, Minder told Scott she wanted

him "to respect" her.  At that time, according to Scott, she conveyed to him, either directly

or indirectly, that she did not want to have sex that night.  (Doc. 69-2, Scott Dep.,

CM/ECF p. 7).  When they arrived at the apartment, they went directly to his bedroom.

(Doc. 60, Minder's statement of facts ¶ 14).  On the bed, they started out on their backs,

and then moved to lying on their right sides, with Minder's back to Scott's front.  (Doc. 69-

2, Scott Dep., CM/ECF p. 8).  They lay cuddled like this for some thirty minutes, talking

about family, when Minder began "thrusting her butt into [Scott's] pelvic area."  (*Id.*,

CM/ECF pp. 8-9).  Scott began "to reciprocate," moving his hand down her leg to her vagina.  She pulled him on top of her, and they both started taking off her pants.  (*Id.*, CM/ECF p. 12).  Minder pulled his arm to signal him to get on top of her.  (*Id.*).  They had sex.  (*Id.*, CM/ECF p. 13).  Afterwards, Minder stayed at the apartment for about thirty minutes.  Scott thought they were both trying to sleep, but Minder said she could not sleep there, that she needed to go home.  (*Id.*, CM/ECF pp. 16-17).  She gave him a hug and kiss, they started talking again, she gave him another hug and a kiss, and then she left.  (*Id.*, CM/ECF p. 17).

While she was there, Minder never said anything to indicate she had changed her mind about having sex that night, Scott never asked her if she had changed her mind, nor did he ask her to have sex.  (*Id.*, CM/ECF pp. 10-11).  However, when she pushed up against him with her butt, he took that "as a hint that she wanted some kind of response."  (*Id.*, CM/ECF p. 10).  Minder never said no at anytime, and he never punched her anywhere on her body, and not in the kidney.  (*Id.*, CM/ECF pp. 14, 19).

After leaving Scott's apartment, Minder called a friend, (doc. 60, Minder's statement of facts ¶ 30), who met her on the street with some other friends.  (*Id.*, ¶ 31).  At about 4:16 a.m., the Penn State police were called.[9]  (Doc. 64, Penn State defendants' statement of material facts ¶ 14).  Defendants Cover and Miller were sent to investigate.  (Id., ¶ 15).  Minder told Cover that Scott had raped her.  (Doc. 65-8, Cover's Incident

---

[9]  Penn State is a "state-related" institution of higher education.  (Doc. 64, the Penn State defendants' statement of material facts ¶ 3).  Under state law, its police officers have the same powers as municipal police officers.  *See* 71 Pa. Stat. Ann. § 646.1 (West 2011).

Report Supplement, CM/ECF p. 2).  She also told him, "It happened to me again," stating that she had been raped two years earlier.  (*Id*.).[10]

       Cover and Miller took Minder to the hospital.  (Doc. 64, Penn State defendants' statement of material facts ¶ 17).  Minder was interviewed by a registered nurse.  According to Cover's report, he was there for the interview and Minder repeated that she had been raped.  (Doc. 65-8, Cover's Incident Report Supplement, CM/ECF pp. 3-4).[11]  She also said during the interview that she had fallen asleep on the bed still fully clothed.  She awoke with Scott on top of her.  Her jeans had been removed.  She told Scott, "No, Please stop."  She attempted to move and turn away, but Scott punched her in the kidney area, then placed his fingers and then his penis into her vagina.  She went along with it because she was afraid Scott would hurt her.  (Doc. 65-8, Cover's Incident Report Supplement, CM/ECF pp. 3-4).

       Cover left and the nurse performed a physical examination of Minder.  Minder complained of pain in her right flank and vaginal area.  (Doc. 64, Penn State defendants' statement of material facts ¶ 21).  On physical examination, the nurse found "reddened areas, including in her neck, upper left shoulder and the middle of her back.

---

[10]  CM/ECF P.  Cover's report indicated that Minder had said the earlier rape had happened while she was a student near Bloomsburg, Pennsylvania.  At her later deposition, Minder said she had told Cover it was at Moravian College.  (Doc. 73-2,/ECF p. 7).

[11]  Scott disputes that Cover was present during the nurse's interview of Minder by citing to a portion of Minder's deposition (doc. 73-2, CM/ECF pp. 9-10), but Minder's testimony is not specific enough to rebut Cover's report.  We observe that the firsthand observations of a police officer in a police report is admissible evidence and hence can be considered on summary judgment.  *Lincoln v. Hanshaw*, No. 08-4207, 2009 WL 1259099, at *1 n.2 (E.D. Pa. May 6, 2009).

Minder also had two ecchymotic areas in her left side flank area in which she had a great deal of tenderness.  In addition, Minder had several reddened areas on her front upper right shoulder, her chest and between her breasts.  There was another area of ecchymosis on Minder's right thigh."  (*Id.*, ¶ 22).  There were other physical signs in the genital area.  (*Id.*, ¶ 23).

Defendant Brooks arrived at the hospital at around 6:35 a.m.  (*Id.*, ¶ 20).  Brooks spoke to one of Minder's friends who met Minder that morning after she left the apartment.  This friend reported that Minder was hyperventilating and hysterical and complaining of pain in her back.  (*Id.*, ¶ 24).  Brooks took copies of the notes of the sexual assault exam and the medical records.  She asked Minder to come to the police station and discuss the incident in more detail.  Minder agreed.  (*Id.*, ¶ 25).

In the meantime, at about 6:18 a.m., defendants Sowerby and Vile contacted District Attorney Madeira to tell him about the reported crime.  The three made plans to attempt a consensual phone call between Minder and Scott and to obtain a search warrant for Scott's apartment.  (*Id.*, ¶ 26).  "At approximately 7:45 a.m., District Attorney Madeira and Assistant District Attorney Lance Marshall arrived at Penn State police services.  After their arrival, a meeting was held attended by Madeira, Marshall, Sowerby, Brooks, Cover, Miller, Rodgers, Vile and Shelow.  At this meeting, it was decided that Minder would be consensualized and that she would attempt to make phone contact with Scott."  (*Id.*, ¶ 27).

This meeting ended at about 8:20 a.m.  Madeira and Marshall met with Minder about the investigative plan.  (*Id.*, ¶¶ 28 and 29).  A consensualized phone conversation took place between Minder and Scott.  After the conversation, by way of some text messages, they agreed to meet at the Hentzel Union Building (HUB) at noon. This was a pretext for the Penn State police to meet personally with Scott about Minder's allegations.  (*Id.*, ¶ 30).

At about 12:40 p.m., Sowerby and Rodgers met Scott at the HUB.  Scott talked with them and confirmed that he and Minder had met at The Saloon; that they did not know each other that well; that before the night in question, he had only "hung out" with her once, lunch at a pizza shop; that "while Minder agreed to stay at his place for the night, she told him not to get the wrong impression and that she wanted him to respect her"; that they had sex; and that "it had been clear to him earlier in the evening that Minder did not want to have sex with him."  (*Id.*, ¶ 34).

Vile prepared a search warrant application for Scott's apartment, completing it around 11:15 a.m.  The affidavit was then approved both by ADA Marshall and ADA Karen Kuebler.  A search warrant was obtained at approximately 11:30 a.m. from the Centre County Court of Common Pleas.  (*Id.*, ¶ 32).  Scott's apartment was searched in the afternoon.  (*Id.*, ¶ 36).

"After they conducted their part of the investigation on October 5, 2007 regarding the alleged assault by Scott, Officers Cover, Miller and Vile had very little further involvement in the investigation."  (*Id.*, ¶ 37).

"On October 7, 2007, Minder met at the Penn State police station with ADA Marshall and Officer Brooks.  Marshall reviewed with Minder the court process.  Marshall then left, and Brooks again did a detailed interview of Minder as to the specifics of the sexual assault and the events leading up to that assault.  Upon the conclusion of that interview, Marshall returned to the interview room to meet with Minder.  He advised Minder that he would be in touch with her once the District Attorney's office and representatives of Penn State police services met on October 11, 2007, to discuss the case further."  (*Id.*, ¶ 38).

"During her discussions with Officer Brooks, Minder told Brooks that she had been assaulted at a previous college, that she had been through the criminal process and that it had not ended favorably toward her.  Minder also told ADA Marshall about the outcome."  (*Id.*, ¶ 39).

"On October 8, 2007, Officer Brooks met with Minder at the police station to take photographs of her injuries as they appeared at that time.  Minder still had redness in her back in the area of her kidney, corresponding to the area where she said Scott had punched her.  Minder related that her arms were still sore and that she continued to have pain in her back."  (*Id.*, ¶ 40).

"On October 9, 2007, Officer Brooks conducted an interview of Nancy Waring, a friend of Minder's who was with her on the evening of October 4, 2007.  Waring was asked about the events prior to Minder going to the Saloon.  She was also questioned as to anything Minder had told her about the sexual assault.  Waring's

statements as to what Minder told her about the assault were consistent with the statements Minder had given to Brooks." (*Id.*, ¶ 41).

"In October 2007, it was the policy and practice of Penn State police services that felony charges would not be brought against a suspect without the approval of the office of the Centre County District Attorney." (*Id.*, ¶ 42).

"On October 11, 2007, a meeting was held at Penn State police services to decide whether to move forward with bringing charges against Austin Scott." The meeting was attended by Maderia, Marshall, Sowerby, Shelow, Brooks and Cover. (*Id.*, ¶¶ 43 and 44). "Marshall led the discussion and did the majority of the talking" at the meeting, which dealt with whether charges should be brought. (*Id.*, ¶ 45). At the conclusion of the meeting, "it was unanimously determined that criminal charges would be filed against Austin Scott. Madeira and Marshall concurred with the decision to file charges, including the filing of felony charges." (*Id.*, ¶ 46).

On the morning of October 12, 2007, defendant Brooks forwarded drafts of the criminal complaint and affidavit of probable cause to Marshall for his review and comment. Marshall made suggestions on the charges and the Affidavit of Probable Cause before the charges were filed. (*Id.*, ¶¶ 47 and 48). Rodgers and Brooks signed the criminal complaint requesting the arrest warrant and its supporting probable-cause affidavit. The complaint was filed the same day. It charged Scott with: (1) rape under 18 Pa. Con. Stat. Ann. § 3121(a)(1)(West 2011), a felony of the first degree; (2) sexual assault under 18 Pa. Con. Stat. Ann § 3124.1 (West 2000), a felony of the second

degree; (3) aggravated indecent assault under 18 Pa. Con. Stat. Ann § 3125(1)), a felony

of the second degree; (4) aggravated indecent assault under 18 Pa. Con. Stat. Ann, §

3125(2), a felony of the first degree; (5) indecent assault under 18 Pa. Con. Stat. Ann. §

3126(a)(1)(West Supp. 2011), a misdemeanor of the second degree; (6) indecent assault

under 18 Pa. Con. Stat. Ann. § 3126(a)(2)(West Supp. 2011), a misdemeanor of the

second degree; and (7) simple assault under 18 Pa. C.S. § 2701(a)(1)(West Supp. 2011),

a misdemeanor of the second degree.

On October 12, 2007, Scott was arrested.  Arrangements were made in

advance to release him immediately on bail.  (*Id.*, ¶ 50 and response thereto).  Scott was

not detained, nor was he committed to jail.  He simply went through the booking process

and was immediately released.  (Doc. 65-27, Scott Dep., CM/ECF p. 12).

On October 27, 2007, a preliminary hearing was held before a

Pennsylvania magisterial district judge.  (Doc. 64, the Penn State defendants' statement

of material facts ¶ 52).  Two witnesses testified, Desiree Minder, and the nurse who

examined her at the hospital.  At the close of the hearing, the Commonwealth withdrew

the two charges of aggravated indecent assault.  As to all other charges, the magisterial

district judge found that there was sufficient evidence to go to trial.  (*Id.*, ¶ 53).  In a pre-

trial motion with the trial court, Scott challenged the sufficiency of the evidence.  On April

15, 2008, the trial court rejected that argument.  (*Id.*, ¶¶ 54 and 55).

On April 18, 2008, District Attorney Madiera moved to dismiss the case,

stating that "[i]n light of the trial judge's ruling on the admissibility of evidence, the

Commonwealth's case is substantially handicapped, and there is no reasonably likelihood that the Commonwealth can meet its burden of proof." (Doc. 65-28, CM/ECF p. 2). This decision was made without consulting Minder. (Doc. 60-4, Brooks Dep., CM/ECF pp. 13-14). The court granted the motion. (Doc. 65-28, CM/ECF p. 2).

The district attorney was referring to the trial court's apparent ruling that Scott could enter into evidence at trial that in a prior criminal proceeding in which Minder was also the complaining witness the defendant had been acquitted of a charge of rape.[12]

As noted, Minder told Cover that she had been raped before when he was the responding officer on the morning of October 5, 2007. Cover did not ask Minder anything about this prior incident, either the facts, who was involved, or the outcome. (Doc. 72, Pl.'s counter-statement of facts ¶ 5). Penn State has a policy on investigating sexual assaults. This policy essentially limits the first officer responding to a sexual assault to investigating the assault itself and to assisting the victim in obtaining psychological and medical care. (Doc. 65-18, the Penn State Policy).

Defendant Brooks was the "primary contact" with Minder. (Doc. 72, Pl.'s counter-statement of facts ¶ 5). As Brooks put it, she knew "this was going to be a high

---

[12]   Neither party has provided the actual ruling, but they both agree as to its substance. The Penn State Defendants have provided us with a transcript from the prior case indicating that the defendant was acquitted of rape, involuntary deviate sexual intercourse, aggravated indecent assault by forcible compulsion, indecent assault by forcible compulsion, and simple assault. The jury hung on the charges of sexual assault, aggravated indecent assault without consent, and indecent assault without consent. (Doc. 74-2, CM/ECF pp. 7-9).

media case," and that she "had a victim that [she] needed to know was strong enough and

ready to move forward with such a sensitive case." (*Id.* ¶ 7).  Brooks also knew that

Minder had been through the criminal process before and it had not been favorable to

her, that it was hard on her family and her relationship with her parents, and that it was a

very negative experience for her.  (*Id.* ¶ 8).  Brooks did not investigate the previous

criminal case until April 2008 when requested to do so by Marshall.  (*Id.* ¶ 9, and doc. 73-

7, Brooks Dep., pp. 10-11).  The minutes from a prosecution meeting held on April 4,

2008, indicate that "Def. will potentially have the Detective from the previous assault

testify" and that "transcripts, criminal complaints, etc, need to be obtained from previous

incident so that the Prosecution can be prepared."  (Doc. 69-6, CM/ECF p. 39).

Before the consensual phone conversation, defendant Rodgers had no

information from Minder that she had been on top of Scott.  Rodgers also did not believe

that Minder had mentioned during the phone conversation that she had asked Scott to

stop.   (*Id.*, CM/ECF p. 6).  After the consensual phone conversation on October 5, 2007,

Rodgers said to Brooks that they should "follow[ ] up" on Scott's statement during the

conversation that Minder had been on top, among other things, so that they were "not

missing anything" and had "as good an understanding as possible of what happened that

night."  (Doc. 72, Pl.'s counter-statement of facts ¶ 10; doc. 73-6, Rodgers Dep., CM/ECF

pp. 6-9).

Penn State's Police Department has a policy that officers cannot alter facts within a submitted police report after criminal charges have been filed.  A request from the District Attorney's Office to an officer to make such changes would be "improper," according to defendant Shelow, Penn State's chief of police.  (*Id.* ¶ 12).

On October 18, 2007, Assistant District Attorney Marshall sent an e-mail to defendant Cover and another police officer, Randy Hoffman, copied to defendant Shelow. In pertinent part, it read as follows:

> While many of you rushed police reports to me at my request and I thank you for that, please go back and take a second (and third) look at your reports.  We know that the defense is going to carefully scrutinize every word of your report, so let's make sure we have corrected typos, double checked our times, identified the correct people, etc.  I would like to be able to turn over police reports to the defense on **November 15**. That is the day of Austin's formal arraignment.  Thank you again.

(Doc. 65-16, CM/ECF p. 26)(emphasis in original).

In an e-mail, dated December 3, 2007, Marshall wrote defendants Vile, Cover and Sowerby as follows:

> I am reviewing the police report that was given to our office, and I see that **NONE** of the typos have been fixed.  The same problems we had back in October, which we all admitted were there have not been corrected.  There has been plenty of time to fix these problems, but as far as I can tell, they have not been. Since [defendant Cover's] is the beginning of the report, here are some of the errors:
>
> You write "Person 1 was transported to MNMC" which literally means Austin Scott was sent to MNMC for a SART evaluation. Although that can be forgiven, you later write that Austin and Desiree "went to **her** house." This is clearly going

> to be made an issue.  I really don't want to continue, but these
> matters **MUST BE CORRECTED!**
>
> As it is, we are withholding discovery and I don't want to be
> seen like we are playing games with the defense, which is
> what we are doing right now.

(Doc. 69-6, CM/ECF p. 29)(emphasis in original)(brackets added).

In another e-mail from Marshall to Madeira on December 4, 2007,

forwarded on the same date from Marshall to Cover and Vile, Marshall wrote that the

Penn State police:

> did not make any of the corrections they said they were going
> to make in terms of typos.  Some of them aren't that big of a
> deal such as "Person 1 was taken to MNMC for a sexual
> assault evaluation."  Person 1 is Austin Scott.  But there is
> another problem which says the two went to "her house" when
> they clearly went to his house, but we know John Karoly will
> make a big issue of these errors saying the police were
> incompetent.

(Doc. 69-6, CM/ECF p. 32).

Brooks's police reports (doc. 65-12) are dated October 7, and 10, 2007;

Sowerby's report (doc. 65-15) is dated October 9, 2007, and shows four handwritten

changes; Rodger's report (doc. 65-9) is dated October 20, 2007; Cover's report (doc. 65-

8) is dated December 5, 2007; and Vile's report (doc. 65-13) is dated December 4, 2007.

Cover testified at his deposition that the only changes he made to his report

were to correct spelling errors.  He had never been asked before to change a report in

that way.  (Doc. 72, Pl.'s counter-statement of facts ¶¶ 15 and 16; doc. 73-5, Cover Dep.,

CM/ECF pp. 14-15).  Cover and Vile have submitted affidavits that they made no substantive changes in their reports.  (Doc. 65-1, Cover Aff., and doc. 65-5, Vile Aff.).

Cover shredded his notes of the investigation because he had gotten to the end of his notebook, and when that happens he shreds the notebook, having been taught this at the academy as a way of protecting the privacy of the information in the reports.  Everything in his notes are in his report.  (Doc. 74-4, Cover Dep., CM/ECF p. 2).  Likewise, defendant Vile shredded her notes on the case, (doc. 73-8, Vile Dep., CM/ECF p. 6), because she normally shreds notes after using them to write a report.  (Doc. 74-5, Vile Dep., CM/ECF p. 2).  She also keeps a notebook and then shreds the notebook after it is full.  (*Id.*).

Cover made his initial report on October 5, 2007.  (Doc. 73-5, Cover Dep., CM/ECF p. 17).  His supplemental report (dated December 5, 2007, and the revised one per Marshall's direction) states that Minder told Scott, "No. Please Stop."  (Doc. 65-8, CM/ECF p. 3).  This remark is not mentioned in the affidavit of probable cause to obtain an arrest warrant (doc. 65-11, CM/ECF pp. 6-9), and Minder denied at her deposition of December 22, 2010, that she made the statement.  (Doc. 69-3, CM/ECF p. 18).  These remarks appear in the affidavit of probable cause for the search warrant, dated October 5, 2007 (doc. 65-14, CM/ECF p. 7), and the application for the consensual phone intercept, dated October 5, 2007.  (Doc. 65-10, CM/ECF p. 3).  At the preliminary hearing held on October 17, 2007, Minder testified that she did say "No" to Scott.  (Doc. 65-21, CM/ECF p. 18).

IV.   *Discussion*

    A.  *The Penn State Defendants' Motion for Summary Judgment*

        1.  *Plaintiff's Federal and State-Law Claims for False Arrest,*
           *Malicious Prosecution, and False Imprisonment Fail Because*
           *There Was Probable Cause to Arrest Plaintiff*

An element common to federal civil-rights claims for false arrest, malicious prosecution, and false imprisonment is a lack of probable cause to arrest the individual. *See White v. Brown*, 408 F. App'x 595, 598 (3d Cir. 2010)(per curiam) (nonprecedential) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634-36 (3d Cir. 1995)(false-arrest and false-imprisonment claims); *Johnson v. Knorr*, 477 F.3d 75, 81082 (3d Cir. 2007)(malicious prosecution claim).  State law claims of false arrest, malicious prosecution, and false imprisonment also require a plaintiff to show there was no probable cause to bring the charges.  *See Mills v. City of Harrisburg*, 350 F. App'x 770, 774 (3d Cir. 2009)(nonprecedential)(state-law claims of false arrest and false imprisonment); *Stringer v. The Pittsburgh Police*, 408 F. App'x 578, 580 (3d Cir. 2011)(per curiam)(nonprecedential)(citing in part, *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993)(state-law malicious prosecution claim).  Hence if there was probable cause to arrest Scott, it would mean that these six claims are meritless.

        Probable cause exists whenever reasonably trustworthy
        information or circumstances within an arresting officer's
        knowledge are sufficient to warrant a person of reasonable
        caution to conclude that an offense has been or is being
        committed by the person being arrested.

*United States v. Laville,* 480 F.3d 187, 194 (3d Cir. 2007). Probable cause is determined by the facts and circumstances within the officer's knowledge at the time of the arrest. *Id.* It "does not depend on whether the suspect actually committed any crime." *White*, *supra*, 408 F. App'x at 598 (quoting *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005)). Only "a fair probability" that he did is required. *Id.* (quoting *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000)). Each case must be examined on its facts. *Wilson*, 212 F.3d at 790.

The Penn State Defendants contend they had probable cause to arrest Plaintiff. They point first to the information supplied by Minder, the complaining witness. Generally, information supplied by the complaining witness is sufficient to support probable cause. There is an exception if the arresting officer knows about "[i]ndependent exculpatory evidence or substantial evidence of the witness's own unreliability" that could outweigh what the complaining witness said. *Id.*

We agree with the defendants that the information supplied by Minder supports probable cause. Shortly after her encounter with Scott, Minder told Cover that Scott had raped her. Cover and a fellow officer Miller took her to the hospital. At the hospital, Minder was interviewed by a registered nurse. Cover was there for the interview, and Minder repeated that she had been raped. She also described what happened. She had fallen asleep on the bed still fully clothed, but awoke with Scott on top of her. Her jeans had been removed. She told Scott, "No, Please stop," and attempted to move and turn away, but Scott punched her in the kidney area. He placed

19

his fingers and then his penis into her vagina.  She went along with it because she was afraid Scott would hurt her.

Minder's physical examination provided support for her claim.  She complained of pain in her right flank and vaginal area.  The nurse found "reddened areas" in her neck, upper left shoulder, her front upper right shoulder, her chest and between her breasts, and the middle of her back.  Minder had two areas of bruising in her left side flank area and a great deal of tenderness there, and bruising on her right thigh.  There were physical signs in the genital area.

Further, interviews with others were consistent with her having been raped. Brooks spoke to one of Minder's friends who had met Minder that morning after she left Scott's apartment.  This friend reported that Minder was hyperventilating and hysterical and complaining of pain in her back.  Another friend confirmed to Brooks that Minder's statements to the friend about the incident were consistent with Minder's statements to Brooks.  Scott himself confirmed that Minder had been in his apartment that night and that they had had sex.

All of the above supports the conclusion that there was probable cause for all of the charges.  In opposing that conclusion, Plaintiff argues that the issue remains one for the jury because Cover and Vile made new reports, destroyed their original ones, and shredded their notes.  He asserts that the record supports that this was done after his arrest to bolster the case against him and to conceal the lack of probable cause.  The jury could therefore conclude that probable cause was absent.

20

We reject this argument.  We agree with the defendants that, contrary to Plaintiff's position, there is no support in the record for the police officers' having falsified their reports.  Cover and Vile made their changes in response to e-mail requests from Assistant District Attorney Marshall.  These e-mails asked only that substantive errors be corrected, along with spelling errors.  They did not exhort the officers to falsify their reports.  Conversely, they instructed the officers to make the reports accurate.  And the only examples of substantive errors given in the e-mails were obvious ones: (1) Scott is identified as the one brought to the hospital, not Minder; and (2) they went to Minder's house, not Scott's.  Moreover, Cover testified at his deposition that the only changes he made to his report were to correct spelling errors, and both Cover and Vile affirm that they made no substantive changes in their reports.

As for the shredding, Cover shredded his notes not because he was acting from an improper motive, but because he had gotten to the end of his notebook, and when that happens he shreds the notebook as a matter of routine, having been taught this at the academy as a way of protecting the privacy of the information in the reports. He testified that everything in his notes were in his report.  Likewise, defendant Vile shredded her notes on the case, because she normally shreds notes after using them to write a report, and she only shreds a notebook after it is full.

We observe here an argument found in Plaintiff's counter-statement of facts.  (Doc. 72, CM/ECF p. 13 n.4).  Plaintiff asserts that there must have been undisclosed substantive changes in the reports based on the following.  Cover made his

initial report on October 5, 2007.  His supplemental (and revised) report of December 5, 2007, states that Minder told Scott, "No. Please Stop."  However, this remark does not appear in the affidavit of probable cause attached to the criminal complaint, and Minder denied at her deposition of December 22, 2010, that she had made the statement. Plaintiff thus argues that the remark was added later; otherwise, such a significant bit of evidence would have been put in the affidavit of probable cause.

The difficulty with this argument, as the defendants point out, is that the remark does appear in the affidavit of probable cause for the search warrant, dated October 5, 2007, and in the application for the consensual phone intercept, dated October 5, 2007.  Additionally, at the preliminary hearing held on October 17, 2007, Minder testified that she did say "No" to Scott.  This evidence defeats a claim of later fabrication.

In opposition to the defendants' contention that they are entitled to qualified immunity, Plaintiff makes other arguments that appear to bear on the issue of probable cause and the propriety of the investigation conducted by the Penn State Defendants. We deal with them as follows.

First, Plaintiff argues that the consensual phone conversation revealed "inconsistencies" in Minder's account.  He bases this on the deposition testimony of defendant Rodgers.  Before the consensual phone conversation, Rodgers had no information from Minder that she had been on top of Scott.  Rodgers also did not believe that Minder had mentioned during the phone conversation that she had asked Scott to

stop.  These concerns do not indicate anything improper in the investigation or Minder's perceived veracity at that time, the same day as the sexual encounter.  Rodgers only wanted to "follow[ ] up," so that they were "not missing anything" and had "as good an understanding as possible of what happened that night."

Second, Plaintiff questions how the defendants handled the prior rape case. There are two aspects to this contention, one dealing with the lack of investigation by Cover and the delay in investigating it by Brooks, the other in the failure to tell Plaintiff about the prior rape case at all.

We find no merit in Plaintiff's position on the investigation.  As the defendants point out, Cover was the officer who made the initial law-enforcement contact with Minder, and under Penn State's policy on investigating sexual assaults, the first officer responding to a sexual assault case is limited to investigating the assault itself and to assisting the victim in obtaining psychological and medical care.  (Doc. 65-18, the Penn State Policy).  In short, it was not his job to investigate the prior rape case, and his failure to do so creates no inference of improper conduct by the Penn State police.

In regard to Brooks, she knew in October 2007 before charges were filed about the prior case and that its outcome was "unfavorable" to Minder.  Plaintiff complains about Brooks's delay in not investigating "the details and charges" of the prior case until April 2008, some six months after Scott had been charged and only after Marshall asked her to do so.  (Doc. 73, Pl.'s Br. in Opp'n at p. 4).  This position does not assist Plaintiff on the issue of probable cause.  Probable cause had already been

established by Minder's allegations and the other facts mentioned above, so Brooks had no duty to investigate further. *See Lincoln v. Hanshaw*, 375 F. App'x 185, 190 (3d Cir. 2010)(nonprecedential).

Moreover, even if the results in the prior rape case and its details were made part of the probable-cause analysis, there still would have been probable cause to initiate the prosecution. *See Wilson*, *supra*, 212 F.3d at 786 (determining that probable cause existed even if the omitted facts were included in the application for an arrest warrant). Minder's allegations in the prior case still resulted in some jurors believing that the defendant was at least guilty of the three crimes of sexual assault, aggravated indecent assault without consent, and indecent assault without consent. This result would not have led a reasonable police officer to believe that Minder's allegations in the case against Scott were so unreliable that there was no probable cause for rape and related charges against Scott.

Plaintiff next argues that the defendants never told him about the prior case, and that he only learned about it accidently from his aunt, who happened to be cutting the hair of a person who was involved in the earlier trial. This cannot be true because the Commonwealth filed a motion for a "gag" order on October 19, 2007, in the criminal case. (Doc. 74-1, CM/ECF p. 2). Attached to that motion was a newspaper article reporting that Plaintiff's defense attorney at the time intended to use the prior rape case in Scott's defense. Hence, whether or not the prosecution told Scott about the prior case is

24

immaterial; he already knew about it through the filing on October 19, 2007, five days after his arrest.

We will enter summary judgment in favor of the Penn State Defendants on the federal and state-law claims for false arrest, malicious prosecution, and false imprisonment.  The issue of probable cause is generally a question for the jury, but when the facts could not lead a reasonable jury to conclude that there was no probable cause, summary judgment may be entered against the plaintiff.  *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788-89 (3d Cir. 2000).

> 2.  *Plaintiff's Federal and State Civil Conspiracy Claims Fail As Against the Penn State Defendants Because There Is No Evidence of a Conspiracy*

Plaintiff alleges that the Penn State Defendants conspired among themselves, with Marshall and Madeira, and with Minder to prosecute him on the rape charge.  In part, to assert a conspiracy claim under section 1983, a plaintiff must establish the elements of a civil conspiracy.  *Ammlung v. City of Chester,* 494 F.2d 811, 814 (3d Cir. 1974) (relying on Pennsylvania civil conspiracy law to set forth the elements).  "A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage."  *Adams v. Teamsters Local 115*, 214 F. App'x 167, 172 (3d Cir. 2007)(nonprecedential)(quoting in part *Hampton v. Hanrahan,* 600 F.2d 600, 620-21 (7th Cir. 1979))(quoted case and internal quotation

25

marks omitted).  The "agreement can be shown by . . . circumstantial evidence."  *Id.; see also Marulli v. Alloy,* Nos. 04-2869 and 04-2874, 2006 WL 2772553, at *8 (D.N.J. Sept. 23, 2006).

Here, the Penn State Defendants argue there is no conspiracy claim because Plaintiff has presented no evidence that they agreed among themselves and Minder to unlawfully prosecute Scott, nor any evidence of any wrongful act.  We agree.  We have examined Plaintiff's conspiracy argument, (doc. 68, Pl.'s Br. in Opp'n to Minder's summary-judgment motion, CM/ECF pp. 13-14), and find it wholly conclusory as to any agreement between the Penn State Defendants and Minder.  Additionally, we have rejected in our discussion above the supposedly unlawful nature of the acts Plaintiff relies on, the alleged changes to the police report and the withholding of information on the prior rape case.  As Defendants point out in their reply brief they did speak with Minder and with the prosecutors, but these were lawful acts, part of their jobs.  *See White, supra,* 408 F. App'x at 599 (no valid conspiracy claim when the plaintiff cannot establish an underlying violation of his constitutional rights).

Since a federal civil conspiracy claim is based on the elements of civil conspiracy under state law, it follows that Plaintiff's state-law civil conspiracy claim also fails.  *See Livingston v. Borough of Edgewood*, 2011 WL 2162925, at *4-5 (3d Cir. 2011)(nonprecedential)(relying on similarities between a federal conspiracy claim under 42 U.S.C. § 1985(3) and a Pennsylvania civil conspiracy claim in affirming a grant of summary judgment on both claims).

3. *Plaintiff's Federal Claims for Supervisory Liability,*
*Failure to Intervene, and for Governmental Liability*
*Lack Merit*

Scott makes a federal "supervisory liability" claim against certain unnamed

supervisory defendants, a "failure to intervene" claim against certain unnamed non-

supervisory defendants, and a "governmental liability" claim against Penn State.

The Penn State Defendants move for summary judgment on the first two

claims, reasoning that in the absence of any underlying substantive violation of Plaintiff's

constitutional rights, these claims fail.  We agree.  *See JGS v. Titusville Area Sch. Dist.*,

737 F. Supp. 2d 449, 458 (W.D. Pa. 2010)(summary judgment granted on supervisory

liability claim when the underlying constitutional claim lacked merit)(citing *City of Los*

*Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)); *Smith v.*

*Dauphin County Adult Prob.*, No. 06-2009, 2007 WL 2692320, at *6 n.6 (M.D. Pa. Sept.

12, 2007)(a probation officer had no duty to intervene with two other probation officers

when the latters' conduct did not violate the plaintiff's constitutional rights).

The defendants also move for summary judgment on the governmental

liability claim, arguing that Plaintiff has failed to establish that Penn State had a policy or

custom allowing its police officers to violate an individual's constitutional rights.  We will

grant summary judgment on this claim as well but for a different reason, that just as with

the two claims above, there is no claim for "governmental liability" when there is no

underlying constitutional violation.  *See Mills, supra,* 350 F. App'x 770, 773 n.2 (municipal

liability claim based on policy or custom cannot succeed when there was no underlying constitutional violation by the municipality's agent).

   B. *Minder's Motion for Summary Judgment*

   A federal civil rights claim under 42 U.S.C. § 1983 requires action under color of state law.  *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010).  A private individual like Minder acts under color of state law if she conspires with a state actor to violate a plaintiff's constitutional rights.  *Max v. Republican Committee of Lancaster County*, 587 F.3d 198, 203 (3d Cir. 2009).  Minder moves for summary judgment on all claims, arguing that there is no evidence that she conspired with the Penn State Defendants to violate Scott's constitutional rights, only that she "cooperated" with them.

   In opposing Defendant's motion, Scott first argues that her statement that she cooperated with Penn State police officers is an admission that she conspired with them.  He next argues that his state-law claims against her do not require state action.

   We disagree with the first argument.  We have set forth above the elements of a federal civil conspiracy claim.  As also noted above, there is no evidence that Minder conspired with the Penn State defendants, or other defendants, that satisfies these elements.  We will therefore enter judgment in Minder's favor on the federal civil-rights claims of false arrest, malicious prosecution, false imprisonment, and civil conspiracy.

    C.  *The Court Declines to Exercise Supplemental*
     *Jurisdiction Over the Remaining State-Law Claims*

    The following state-law claim remains against the Penn State Defendants

and Minder: a claim under Pa. Const. art. I, § 8.  The following state-law claims remain

against Minder: a claim for false arrest and illegal imprisonment, a claim for malicious

prosecution, and a claim for civil conspiracy.  Since all of the federal claims have been

disposed of, the court declines to exercise supplemental jurisdiction over these claims

and will dismiss them without prejudice to Plaintiff's pursuing them in state court.  *See*

*Burnsworth v. PC Laboratory*, 364 F. App'x 772, 776 (3d Cir. 2010)(nonprecedential).

    We will issue an appropriate order.


          /s/William W. Caldwell
         William W. Caldwell
         United States District Judge


DATE: July 11, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

AUSTIN T. SCOTT,                          :

        Plaintiff                          :

                                     :

        vs.                          CIVIL NO. 4:CV-09-1989
                                     :

LANCE MARSHALL, et al.                    :

        Defendants                          :

*O R D E R*

AND NOW, this 11th day of July, 2011, it is ordered that:

   1.  The motion (doc. 59) for summary judgment of defendant, Desiree Minder, is granted as follows:

     a.  the Clerk of Court shall enter judgment in favor of defendant Minder and against Plaintiff on the federal civil-rights claims in Count I for false arrest; in Count II for malicious prosecution; in Count III for false imprisonment, and in Count VI for a federal civil conspiracy claim;

     b.  The state-law claims against defendant Minder in Count VIII (incorrectly styled as Count VI) for a violation of Pa. Const. art. I, § 8, in Count IX (incorrectly styled as Count VII) for false arrest and illegal imprisonment, in Count X (incorrectly styled as Count VIII) for malicious prosecution, and in Count XI (incorrectly styled as Count IX) for civil conspiracy are dismissed without prejudice to Plaintiff's pursuing them in state court.

   2.  The motion (doc. 63) for summary judgment of defendants, The Pennsylvania State University, Stephen

Shelow, Thomas Sowerby, Matthew Cover, Ryan Rodgers, Dustin Miller, Stephanie L. Brooks, and Christine D. Vile, is granted as follows:

    a.  the Clerk of Court shall enter judgment in favor of defendants, The Pennsylvania State University, Stephen Shelow, Thomas Sowerby, Matthew Cover, Ryan Rodgers, Dustin Miller, Stephanie L. Brooks, Christine D. Vile, and the Penn State "John/Jane Does," and against Plaintiff on the claims in Count I for false arrest; in Count II for malicious prosecution; in Count III for false imprisonment; in Count IV for a federal supervisory liability claim; in Count V for a federal failure-to-intervene claim; in Count VI for a federal civil conspiracy claim; in Count VII (incorrectly styled as Count V) for a federal governmental liability claim; in Count IX (incorrectly styled as Count VII) for state-law false arrest and illegal imprisonment; in Count X (incorrectly styled as Count VIII) for state-law malicious prosecution; and in Count XI (incorrectly styled as Count IX) for state-law civil conspiracy.

    b.  The state-law claim against these defendants in Count VIII (incorrectly styled as Count VI) for a violation of Pa. Const. art. I, § 8 is dismissed without prejudice to Plaintiff's pursuing it in state court.

  3.  The Clerk of Court shall close this file.

                /s/William W. Caldwell
               William W. Caldwell
               United States District Judge